UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 6:21-cr-00013-GFVT-HAI-2 |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| LORI BARNETT, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

This matter is before the Court on Defendant Lori Barnett's Motion to Suppress [R. 190.] Ms. Barnett argues that suppression of evidence is warranted because she was subjected to custodial interrogation without having been informed of her *Miranda* rights, because she did not give a voluntary interview, and because DEA agents violated ethical rules imputed onto them. [R. 190.] In opposition, the Government argues that Ms. Barnett was not in custody when she was interviewed, that her interview was voluntary, and that no ethical rules were violated. [R. 198.] Having reviewed the briefing and conducted an evidentiary hearing, the Court **GRANTS** Ms. Barnett's Motion [R. 190.]

**I**

Ms. Barnett faces a slew of charges related to her employment as a registered nurse and administrative employee at EHC, a medical facility "designed to combat the opioid epidemic" and founded by her co-defendant, Dr. Robert Taylor. [R. 1; R. 190 at 1-2.] Sometime prior to December 2018, various federal agencies began investigating EHC. *Id.* On the morning of December 13, at least a dozen armed federal agents arrived at Ms. Barnett and Dr. Taylor's home to execute a search warrant and were led by DEA Special Agent Jared Sullivan. [R. 190 at 2; R.

198 at 2.] Before approaching the home, the agents met for a pre-op meeting, where Agent Sullivan implied that one primary goal of the day was to interview Ms. Barnett. [Tr. at 13.] After this meeting, the agents approached the home and announced their presence. [R. 190 at 2.] When Dr. Taylor opened his front door, both he and his elderly mother were directed away from the doorway. *Id.* The agents then entered the home with guns drawn and conducted a five-to-ten-minute protective sweep of the approximately 5,100 square foot premises, which included a pat down of Dr. Taylor and Ms. Barnett. [*Id.*; R. 198 at 2.] During the sweep, Ms. Barnett and Dr. Taylor's cell phones were confiscated, and the agents disabled the home's video security system. *Id.* While in possession of the cell phones, Agent Sullivan "observed incoming text messages from E.J. Sodd," who he knew to be EHC's lawyer, but did not open or read the messages. [Tr. at 49.]

After the initial protective sweep was completed, Dr. Taylor's elderly mother and her husband were permitted to leave the premises and to "take the children and dog with them." [R. 190 at 3.] But for the next five hours, Ms. Barnett remained seated at her kitchen table while her home was searched and while Dr. Taylor was interviewed. [R. 225 at 63.] During this period, Ms. Barnett argues that she was not permitted to move, was forced to use the restroom with the door open in view of a male officer, and was not informed that she was free to leave her home. [*See* R. 190 at 10-13.] The Government disputes these contentions and argues that Ms. Barnett remained at her home voluntarily, was informed that she was free to leave, and that her movements were permissibly restricted for officer safety. [*See* R. 198 at 5-6.]

Once Dr. Taylor's interview was completed, Agent Sullivan approached Ms. Barnett and stated "[w]ell let's see if we can't just talk to you real quick, if you're ok with it Lori." [R. 198 at 5.] When Ms. Barnett agreed, she was taken to the basement theater room of her home, where

2

Dr. Taylor had suggested the interviews occur. *Id.* at 6; *see* Def. Exh. 3. Once in the theater room, Ms. Barnett sat on a stool, while Agent Sullivan and two other officers stood near her. [*Compare* Tr. at 200 (indicating Ms. Barnett was directed to sit on the stool) *with* R. 198 at 6 ("[s]he was given free choice of where to sit, which was in a chair near the door to the room.")]. Approximately five or six other agents stood outside of the theater room behind a pair of doors. [Tr. at 202.] It is undisputed that, before conducting the interview, Agent Sullivan did not inform Ms. Barnett that she was free to leave and did not read her *Miranda* rights. He did instruct her, however, that she was not under arrest and reassured her that she was not in trouble when asked if she should contact her lawyer. *Id.* at 177-78. Ms. Barnett was further cautioned: "if there is a question you don't want to answer, don't answer." [R. 200 at 7.]

Ms. Barnett's interview lasted for approximately two and a half hours, during which time she provided incriminating statements about her involvement with EHC. [Tr. at 203.] Though Dr. Taylor characterizes his interview with the agents in a positive light, Ms. Barnett contends that she felt forced to comply with the interview. [Tr. at 178; R. 200 at 5 ("Dr. Taylor had allegedly stated that the officers had been "polite" and "professional" during *his* interview.").] Ultimately, Ms. Barnett argues that suppression of the interview evidence is appropriate because she was subjected to custodial interrogation without being read her *Miranda* rights in violation of the Fifth Amendment, because her interview was involuntary, and because the agents violated ethical rules. In opposition, the Government contends that Ms. Barnett was not in "custody," was not required to have been read her *Miranda* rights, gave a voluntary interview, and that no ethical rules were violated. This matter is now ripe for review.

## II

The Fifth Amendment to the United States Constitution provides that "[n]o person...shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. This right is guarded by the prophylactic rule of *Miranda v. Arizona*, which requires law enforcement officers to give warnings, including the right to remain silent, before conducting a custodial interrogation. 384 U.S. 436, 444 (1966); *Stansbury v. California,* 511 U.S. 318, 322 (1994). However, "police officers are not required to administer *Miranda* warnings to everyone....they question." *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). The warnings are required only "when there has been such a restriction on a person's freedom as to render him 'in custody.'" *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *Oregon,* 429 U.S. at 495.

In determining whether an interrogation occurred while a defendant was "in custody," courts are to consider the totality of the circumstances surrounding the encounter "with the ultimate inquiry turning on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *Stansbury,* 511 U.S. at 322) (internal quotation marks omitted). This inquiry is objective, focusing on how "a reasonable person in the suspect's position would perceive his or her freedom to leave," rather than the suspect's actual mindset. *J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2402 (2011) (internal citations and quotation marks omitted); *Yarborough*, 541 U.S. at 667. In making this determination, this Court is guided by the following factors articulated by the Sixth Circuit:

> (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.

*Hinojosa*, 606 F.3d at 883 (citing *Panak,* 552 F.3d at 465, *United States v. Swanson,* 341 F.3d 524, 529 (6th Cir. 2003), *United States v. Salvo,* 133 F.3d 943, 950 (6th Cir. 1998)).

The dispositive question in this matter is whether Ms. Barnett was "in custody" when she was interviewed. To make this determination, the Court must consider the totality of the circumstances, as guided by the non-exhaustive list of factors provided in *Hinojosa*. *See* 606 F.3d at 883.

A

Ms. Barnett was interviewed in the basement theater room of her home. The theater room was chosen as a suitable interview location by Dr. Taylor. [R. 198 at 6; *see* Def. Exh. 3.] In her Motion, Ms. Barnett concedes that when a person is questioned in their home, the questioning will often "'not rise to the kind of custodial situations that necessitates *Miranda* warnings.'" [R. 190 at 7 (citing *United States v. Conder*, 529 Fed. App'x 618, 622 (6th Cir. 2013)) (internal citations omitted).] But she argues that this matter poses an exception to the general rule. [R. 190 at 7 (citing *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016)) (while "[t]he home is the most constitutionally protected place on earth; […] the right to terminate the interrogation and be free to leave is hollow if the one place that the individual cannot retreat to, or exclude law enforcement from, is her home.").]

In support of a finding of custody, Ms. Barnett argues that her home was "dominated" by agents and law enforcement from various agencies, that the agents arrived with guns drawn, and that she was isolated from her husband. [R. 190 at 8-9.] Further, Ms. Barnett contends that that the agents "directed her every movement" throughout the day, including requiring her to use the restroom with the door open in view of a male officer. [*See id.*; *see also* Tr. at 175.] For these

5

reasons, Ms. Barnett contends that her home was controlled in a such a way "that a reasonable person in her position would have felt restrained and in custody." *Id.* at 9.

In response, the Government argues that the Court should not focus on events that occurred throughout the day of the search, but instead should limit its custodial analysis to "the time that the relevant statements were made." [R. 198 at 9 (citing *United States v. Swan*, 842 F.3d 28, 31-32 (1st Cir. 2016)).] Accordingly, the Government contends that the presence of the officers in the home during the day and their actions before the interview began are inconsequential to the custody analysis. [*See* R. 198 at 9.] If the events prior to Ms. Barnett's interview are to be analyzed, however, the Government argues that Ms. Barnett's home was not transformed into an officer-dominated environment from which a reasonable person would have believed themselves to have been in custody.

First, the Government argues that the "officers' brief protective sweep of the home in the morning did not make the Defendant's afternoon interview custodial." [R. 198 at 13-16 (citing *Mich. v. Summers*, 452 U.S. 692, 702 (1981)); *United States v. Streifel*, 781 F.2d 953 (1st. Cir. 1986) (indicating that some seizures do not require *Miranda* warnings because seizures do not always predicate custodial interrogation).] Second, the Government states that the basement theater room where Ms. Barnett's interview occurred was chosen at Dr. Taylor's suggestion, that "[s]he was given free choice of where to sit," and that "[n]o one positioned himself or herself between the Defendant and [the] exit." [R. 198 at 6; *Compare* R. 225 at 200 (indicating Ms. Barnett was directed to sit on the stool) *with* R. 198 at 6 ("[s]he was given free choice of where to sit, which was in a chair near the door to the room.")].

Upon review, factor one weighs in favor of a finding of custody. But the Court must first clarify that its balancing of the totality in this matter does not fully exclude the actions and

6

events preceding Ms. Barnett's interview. Though the Government is correct that the Court must focus on whether Ms. Barnett was in custody at the time she was interviewed, and that the fact that she may have been in custody at other points in the day is not dispositive, the Court's analysis is not so restrictive as to require it to ignore the full events of the day. *See United States v. Wallace*, 323 F.3d 1109, 1112 (8th Cir. 2003) ("Our main focus must be on the individual's restraint *during the interview*."). This is because, though the Court's custody analysis is focused on the interview itself, events preceding the interview are relevant to understanding a reasonable person's later perception of custody. *See*, *e.g., United States v. McCarty*, 475 F.3d 39, 46 (1st Cir. 2007) (finding the removal of handcuffs before an interview to have impacted whether a reasonable person would have believed themselves to still be in custody during the interview); *United States v. Thomas,* 193 Fed. App'x 881, 886 (11th Cir. 2006).

    For example, in *United States v. Thomas*, the Eleventh Circuit analyzed the impact of the removal of a suspect's handcuffs before his interview on the custody analysis. 193 Fed. App'x at 886. Ultimately, the court found that the removal of handcuffs before the suspect's interview signaled that he was no longer in custody and could elect to leave the interview. *See id.* Though the suspect subjectively believed that he remained in custody even after his handcuffs had been removed, the court found that a reasonable person would not have. Accordingly, despite the Government's desire for the Court to limit its analysis to when Ms. Barnett's interview began, the Court may examine events preceding her interview to determine if the events shape a reasonable person's belief of custody during the interview.

    Having determined it appropriate to analyze a larger scope of the day in its custody analysis, the Court must next determine how the location of Ms. Barnett's interview impacts the

7

custody analysis. Ms. Barnett was interviewed in the theater room of her finished basement inside of her own home. The Sixth Circuit describes the home as:

> [P]resumably [] the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave.

*Conder*, 529 F. App'x at 622.

For this reason, interviews inside of one's own home often do "'not rise to the kind of custodial situations that necessitates *Miranda* warnings.'" *Conder*, 529 Fed. App'x at 622. But a reasonable person's understanding of whether they are in custody can be impacted if the "unrestrained" freedoms of their home are removed, such as when the home becomes "police-dominated." *United States v. Craighead*, 539 F.3d 1073, 1084-85 (9th Cir. 2008). Here, Ms. Barnett's home was filled with at least twelve agents from various federal agencies. [R. 190 at 2.] At least initially, multiple agents entered the home with their guns drawn. *Id.* While Ms. Barnett was not always surrounded by all twelve officers while she was detained in her kitchen, "[t]here were so many officers or investigators […] there were people coming and going through the kitchen quite regularly." [Tr. at 109.] Finally, when Ms. Barnett was interviewed, she was taken to a basement room, where she sat across from three officers, and was aware that multiple other officers stood outside of a nearby set of doors. [Tr. at 201-202.]

Upon review, it is evident that Ms. Barnett's home was police dominated and that, as a result, a reasonable person would have believed themselves in custody during Ms. Barnett's interview. This finding is evidenced by the sheer number of officers in Ms. Barnett's home, who worked on behalf of multiple agencies, and because several officers arrived with unholstered weapons. *Craighead*, 539 F.3d at 1084 (collecting cases) ("When a large number of law enforcement personnel enter a suspect's home, they may fill the home to such that there are no

8

police-free rooms or spaces to which the suspect may retreat […]); ("In addition, if the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably believe that his home is no longer safe from the threat of police force.").

It is evident that Ms. Barnett was lawfully detained while the search of her home was ongoing. *Summers*, 452 U.S. at 705 ("Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."). Here, the Government asks the Court to ignore that Ms. Barnett's home was police-dominated and that she was detained for five hours before being interviewed because the agents' actions were lawful. But simply because her earlier detention was lawful does not negate the impact that the detention and police-dominated environment has on a reasonable person's belief of later custody. *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st. Cir. 2007) ("If the government is correct that the agents' actions were necessary for evidence preservation and officer safety, then it could have chosen to postpone the interrogation until a non-custodial moment, or to Mirandize [the defendant]. Either step would have protected both the defendant's constitutional rights and the officers' legitimate law enforcement needs."). So, "[w]hile an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody," it is unlikely that a reasonable person in Ms. Barnett's police-dominated home, who had been detained for five hours before being interviewed, would have felt free to make the decisions one is ordinarily able to make inside of their home, despite the lawfulness of the agents' actions. Consequently, this factor weighs in favor of an in-custody determination.

**B**

The length and manner of Ms. Barnett's questioning does not heavily impact the Court's custody analysis when viewed in totality. In her briefing, Ms. Barnett indicates that her interview lasted for "well over two hours" and was so lengthy as to weigh in favor of a finding of custody. [R. 190 at 3; R. 190 at 9-10; R. 200 at 8; Tr. at 31 ("you spent about three hours with Ms. Barnett.").] In support of her contention, Ms. Barnett cites *United States v. Holt*, in which the Sixth Circuit held that a defendant's interview of "approximately two hours [] support[ed] his argument that he was in custody," but was offset by the remainder of the totality. 751 Fed. App'x 820, 824 (6th Cir. 2018); *see also United States v. Talley*, 2020 U.S. Dist. LEXIS 6172 at *10 (S.D. Oh. Jan. 14, 2020); *Yarbourough v. Alvarado*, 541 U.S. 652, 664 (2004) (finding a two-hour long interview to be a factor weighing in favor of finding a defendant in custody); *cf United States v. Martinez*, 795 Fed. App'x 367, 374 ("The district court found that the length of the interview (eighty minutes) was not itself problematic. We agree."). Though Ms. Barnett does not explicitly take issue with the manner of her questioning, she does argue that she felt forced to answer the questions posed to her and declines to accept Dr. Taylor's characterization of the questioning as congenial. [Tr. at 178; R. 200 at 5 ("Dr. Taylor had allegedly stated that the officers had been "polite" and "professional" during *his* interview.").]

In opposition, the Government cites cases from the First and Second Circuits in which interviews ranging between ninety minutes and two hours in length were found to be non-custodial. [R. 198 at 13 (citing *Faux*, 828 F.3d at 139); *United States v. O'Neal*, 2018 U.S. Dist. LEXIS 177373 at *8 (D.C. Maine Oct. 16, 2018) ("The First Circuit has described a 90-minute interview as 'relatively short' in duration, and the interview here lasted about an hour more than

10

that benchmark.") (internal citations omitted). Under these cases, the Government argues that "[t]he length of the Defendant's interview did not render it custodial." [R. 198 at 13.]

The Sixth Circuit in *Holt* indicated that an "approximately two hour[]" long interview supported a defendant's argument that he was in custody. Though the *Holt* court ultimately found the defendant to was not subjected to a custodial interview, it considered the two-hour length of the interview a factor weighing in favor of custody. Consequently, despite the Government's citation to the holdings of sister circuits, the Court is bound by the precedent of the Sixth Circuit and finds the "well over two hour[]" length of Ms. Barnett's interview weighs in favor of a finding that she was in custody. [R. 190 at 3.] But the Court also concludes that the manner of Ms. Barnett's questioning was not aggressive or unduly burdensome, which lessens the impact of the length of the interview on the Court's custody analysis in totality. [*See* Def. Exh. 3 (audio

### C

It is undisputed that Ms. Barnett had limited freedom of movement in the five hours preceding her interview while a search of her home was conducted. But what is disputed is whether her earlier detention affects the analysis of whether a reasonable person would have believed themselves to have remained in custody when interviewed. In her Motion, Ms. Barnett contends that, while the agents searched, she was not permitted free movement around her home, was separated from Dr. Taylor, had her cell phone confiscated, and had to leave the door open in view of a male officer when she went to the restroom. [R. 190 at 10-11; Tr. at 174.] Ms. Barnett also states that her freedom of movement was limited during the interview itself because she was interviewed in a basement theater room by three officers, was told where to sit, and was aware of the presence of several more officers outside of a nearby door. [Tr. at 200.]

11

In response, the Government argues that Ms. Barnett was lawfully seized during the pendency of the search for officer safety and to prevent evidence destruction, as is normal police protocol. [R. 198 at 15 (citing *United States v. Toby*, 1997 U.S. App. LEXIS 16393 at *8, n.4 (6th Cir. 1997) ("Toby claims that because the agents watched him move around his house, he was in custody. We disagree."); *see also United States v. Hughes*, 640 F.3d 428, 436 (1st Cir. 2011) (holding that officers accompanying a defendant outside to smoke a cigarette did not render the defendant in custody)]. Accordingly, the Government contends that her lawful detention during the search of her home does not mean that she remained in custody when interviewed. The Government also disputes that Ms. Barnett was told where to sit, and that she was unable to move during the interview itself. [R. 198 at 6; Tr. at 64 (officers asking Ms. Barnett if she needed something to eat or drink before the interview began and indicating that she could have whatever she needed because "[i]t's your house.")].

Upon review, the Court finds this factor to weigh slightly in favor of a finding of custody. During the interview itself, Ms. Barnett was not physically restrained, was not told that she could not move about the room, and no evidence indicates that Ms. Barnett was forcibly isolated from the outside world. *See Martinez*, 795 Fed. App'x at 376. For example, while Ms. Barnett did not have access to her own phone during her interview, the officers clearly provided her an opportunity to use one of their cell phones to make a phone call if she wanted to. [Tr. at 63; *United States v. Levenderis*, 806 F.3d 390, 400-401 (6th Cir. 2015) ("Defendant was able to place and receive phone calls during the interviews, something a reasonable person in police custody would not feel free to do) (citations omitted)). Additionally, there is no indication that Ms. Barnett asked for a break during her questioning and was refused.

But the Court cannot ignore the restraint of movement Ms. Barnett experienced during the five hours preceding her interview. While the Court's inquiry is specifically focused on whether Ms. Barnett was in custody during the interview itself, events that occur before an interview begins, as explained above, can impact whether a reasonable person would believe themselves to be in custody during the interview itself. *Wallace*, 323 F.3d at 1112; *Thomas*, 193 Fed. App'x at 886.

Here, it is evident that Ms. Barnett experienced no additional restriction on movement during her interview. But, unlike, for example, the physical removal of the handcuffs, no clear signal was given to Ms. Barnett that her previous restriction on movement had been lifted. Without this signal, a reasonable person in Ms. Barnett's position would have believed their interview a continuation of their earlier detention. Consequently, while Ms. Barnett was likely lawfully detained while the search of her home was ongoing, the lawfulness of her earlier detention does not negate whether a reasonable person in her position would have believed themselves to later remain detained. *Mittel-Carey*, 493 F.3d at 40. ("If the government is correct that the agents' actions were necessary for evidence preservation and officer safety, then it could have chosen to postpone the interrogation until a non-custodial moment, or to Mirandize [the defendant]. Either step would have protected both the defendant's constitutional rights and the officers' legitimate law enforcement needs.").

**D**

The final *Hinojosa* consideration also weighs in favor of a finding of custody. Before she was interviewed, Ms. Barnett was told that she was not under arrest and that she could not answer any question if she chose. [Tr. at 177-78; R. 200 at 7.] But she was not told that she was free to leave or that she could stop her interview if she elected. At the evidentiary hearing in this

13

matter, the Government argued that at some point during the day Task Force Officer Hart informed Ms. Barnett that she was free to leave her home and that, accordingly, Ms. Barnett should have carried this knowledge to her interview despite Agent Sullivan failing to remind her. [*See* Tr. at 79, 97.] But Ms. Barnett disputes that she was ever told that she could leave her home and that is why she remained seated in her kitchen for most of the day. *Id.* at 177.

At the evidentiary hearing, this difference in memory was heavily litigated. When asked if he was confident that he had informed Ms. Barnett she was free to leave her home, TFO Hart agreed that he was "100 percent confident" that he had done so. [Tr. at 135.] But, when asked the general time of day he informed Ms. Barnett she could leave, TFO Hart said he would "be guessing" and could not recall if he told her in the morning, early evening, or evening. [Tr. at 111-112.] Further, despite recognizing that it is "very important to memorialize statements" made by defendants, TFO Hart admitted he did not memorialize whether Ms. Barnett understood that she was free to leave her home. *Id.* at 113. Notwithstanding his shaky memory, however, TFO Hart argued that he was sure he informed Ms. Barnett that she could leave her home because he wanted her to leave so he did not have to monitor her all day and acted in accordance with his preference. [*See* Tr. at 135.] In opposition, Ms. Barnett argued that she was never told she could leave her home because, if she had been told that she could leave, she "would have left and called [her] lawyer." [Tr. at 172.]

Forced to make a factual determination, the Court finds Ms. Barnett's recollection more reliable than TFO Hart's. To be clear, the Court does not question TFO Hart's veracity or sincerity, but given the totality of the circumstances, the Court finds that TFO Hart is likely mistaken about whether notice was given.

"Whether the investigators inform a suspect that he is free to leave or to refuse to answer questions is the most important consideration in the *Miranda* custody analysis." *Martinez*, 795 Fed. App'x 367.  Here, Ms. Barnett was told that she was not under arrest and that she could choose to not answer questions.  But, while these statements are mitigating to the finding of custody, the Court finds that a reasonable person in Ms. Barnett's position, having never been informed that she could leave her home and having watched the search of her home for five hours preceding her interview, would not have understood that they could stop their interview and walk away if they so chose.  *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003) (defendant being told he was not under arrest weighed against a finding of custody); *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006) ("While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine.").  Accordingly, having determined that Ms. Barnett was never told she could leave her home, the other precautions given to her are less impactful.

### III

Upon a review of the totality of the circumstances in this matter, the Court finds that a reasonable person in Ms. Barnett's position would not have understood themselves free to leave her interview because her home was police-dominated, her freedom of movement before her interview was heavily restricted and a reasonable person would not have understood that her prior detention had been lifted, because her interview lasted for two hours, and because she was never told that she could leave her home or stop her interview.  Though the questioning of Ms. Barnett itself was not aggressive or unduly burdensome, the totality nonetheless weighs in favor of suppression.  Having found suppression warranted, the Court need not analyze whether Ms.

Barnett's interview was voluntary or whether the agents violated any ethical rules mandating suppression. Accordingly, the Court **ORDERS** as follows:

1. Ms. Barnett's Motion to Suppress [R. 190] is **GRANTED**;

2. The Court Reporter is **DIRECTED** to file the transcript of the suppression evidentiary hearing into the Record.

This the 11th day of May, 2022.

Gregory F. Van Tatenhove
United States District Judge